## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**ALAN W. ELSE,**

      **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 3:20-CV-00250**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered April 9, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 11, 12)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 11); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 12); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

1

The Plaintiff, Alan W. Else, (hereinafter referred to as "Claimant"), protectively filed his application for benefits on or about January 11, 2017, alleging disability since January 9, 2007, due to a pituitary tumor, a brain tumor, back and sleep problems. (Tr. at 12, 90, 201-207, 233) His claim was initially denied on April 10, 2017 (Tr. at 116-120) and again upon reconsideration on May 16, 2017 (Tr. at 122-124). Thereafter, Claimant filed a written request for hearing on June 28, 2017 (Tr. at 125-126).

An initial administrative hearing was held on October 18, 2018 before the Honorable Neil Morholt, Administrative Law Judge ("ALJ"), however, the hearing was postponed for Claimant to obtain representation (Tr. at 82-101, 163). On January 10, 2019, the hearing resumed (Tr. at 29-81) On February 27, 2019, the ALJ entered an unfavorable decision. (Tr. at 9-28) On April 24, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 194-198) The ALJ's decision became the final decision of the Commissioner on February 24, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On April 8, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 11), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 12). Consequently, this matter is fully briefed and ready for resolution.

**<u>Claimant's Background</u>**

Claimant was 48 years old as of the alleged onset date, which is defined as a "younger person", but then he subsequently changed age category to a "person closely approaching

advanced age", as he was 52 on the date last insured ("DLI"). <u>See</u> 20 C.F.R. § 404.1563(c), (d). (Tr. at 22) Claimant has a high school education, having obtained his GED in 1977. (Tr. at 234) Claimant has an extensive work history, which included: greens keeper; machine assembler; auto salesperson; concrete finisher; lineman; mason; delivery truck driver; and hand packager. (Tr. at 75-76) Claimant's past relevant work consisted of a variety of exertional and skilled categories, including light, skilled (auto salesperson, machine assembler) to heavy, skilled (concrete finisher, mason) as opined by the vocational expert. (<u>Id</u>.)

**<u>Standard</u>**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. <u>Id</u>. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. <u>Id</u>. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

3

work. Id. § 404.1520(f).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status on June 30, 2010. (Tr. at 14, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since January 9, 2007, the alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: removal of benign pituitary tumor; degenerative disc disease of the cervical and lumbar spine; and mild carpal tunnel syndrome. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

except he could: occasionally climb ramps and stairs; never climb ladders, ropes,

or scaffolds; frequently balance, stoop, and crouch; occasionally kneel and crawl; frequently use foot controls; frequently push/pull with the lower extremities bilaterally; should avoid frequent exposure to vibration, unprotected heights, and moving mechanical parts; frequently handle, finger, and feel bilaterally; frequently push/pull with the upper extremities bilaterally; and make frequent use of hand controls.

(Id., Finding No. 5)

At step four, the ALJ found Claimant was capable of performing his past relevant work as an auto salesperson and machine assembler through the DLI. (Tr. at 21, Finding No. 6) The ALJ also made an alternative finding at step five, noting that in addition to the immateriality of transferability of job skills, that Claimant's age, education, work experience and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant could perform though his DLI, including: price marker; package labeler; and routing clerk. (Tr. at 22-23) Finally, the ALJ determined Claimant had not been under a disability from January 9, 2007 through June 30, 2010, the DLI. (Tr. at 23, Finding No. 7)

## Claimant's Challenges to the Commissioner's Decision

In support of his appeal, Claimant asserts that the ALJ erred by finding his physical impairments were not disabling prior to his DLI because the medical records show that Claimant continued to have numerous symptoms even after treatment. (ECF No. 11 at 5-6) Claimant specifically points to his problems stemming from his pituitary tumor removal, laminectomy, joint pain, degenerative disc disease of his lumbar spine, and chronic neck pain causing numbness and tingling in his hands. (Id.) Claimant also argues that the ALJ "downplayed" his mental impairments, and that the record showed he suffered from numerous symptoms that Claimant's cognitive abilities were compromised prior to his DLI. (Id. at 7) Next, Claimant contends the ALJ did not fairly and reasonably evaluate Claimant's RFC or his credibility in light of the medical

evidence, as his mental and physical impairments preclude all substantial gainful activity. (Id.) Claimant further argues that the ALJ failed to develop the record, as neither a physical consultative examination nor a mental consultative examination was obtained, and also, the ALJ did not obtain an opinion from a medical expert concerning Claimant's RFC. (Id. at 7-8) Finally, the ALJ erred by not finding Claimant "grids-out" prior to his DLI pursuant to Grid Rule 201.12 or 201.14. (Id. at 8) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id.)

In response, the Commissioner asserts that with respect to the relevant period at bar, the ALJ properly considered the medical evidence, Claimant's activities of daily living, his subjective complaints, as well as Claimant's wife's testimony when finding he was capable of performing light work. (ECF No. 12 at 10-11) The ALJ also considered the statements in Claimant's representative's post-hearing brief but found them inconsistent with the opinions and observations of the medical doctors in the record. (Id. at 12)

This included evidence from the record that showed during the relevant period: that Claimant reported being "extremely happy" with the result of his tumor removal surgery; that he did not receive surgical intervention with regard to his joint and low back pain with left leg radiation; that he did not comply with physical therapy, electing to do home exercises; that he did not receive continued treatment for his back; that he did not receive any further treatment for his carpal tunnel syndrome beyond splints; that he reported to a provider that his neck pain was "not a 'major issue' for him"; and that since his tumor removal, Claimant's symptoms improved. (Id. at 12-14) The ALJ also considered Claimant's nonsevere impairments in determining the RFC. (Id. at 14) The ALJ considered, and rejected the state agency consultants' opinions, who found

insufficient evidence to make a reasonable assessment of Claimant's functioning during the relevant period; instead, on the basis of the record before him, the ALJ determined Claimant was capable of light work. (Id. at 15)

As for Claimant's mental impairments, the Commissioner asserts that the vocational expert testimony addressed any possible mental limitations Claimant could have been experiencing due to his physical impairments, and identified two occupations that would take no more than thirty days to learn. (Id.)

The Commissioner argues that the ALJ was under no duty to obtain consultative examinations or medical expert testimony, and the ALJ was not obligated to act as Claimant's counsel; regardless, the ALJ had sufficient evidence in the record to render a decision. (Id. at 16)

The ALJ appropriately applied the Regulations when he alternatively found Claimant was capable of performing other light work during the relevant period, therefore, the ALJ did not err by finding Claimant disabled pursuant to grid rules 201.12 or 201.14 as Claimant was not limited to sedentary work. (Id. at 16-17) Because the ALJ already determined Claimant could still do his past relevant work, he did not have to reach step five to decide this case. (Id. at 17-18)

Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 18)

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

The Medical Record From the Relevant Period:

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

In March 2004, Claimant was treated for joint pain; the examiner also diagnosed Claimant with carpal tunnel syndrome (Tr. at 1063-1064). In December 2004, Claimant alleged low back pain that radiated to his left leg that worsened with sitting and standing, and the examiner reported that radiographic studies of the spine had shown disc degeneration and disc displacement (Tr. at 1133). EMG testing in February 2005 showed mild carpal tunnel syndrome, and his doctor prescribed wrist splints (Tr. at 1102-1103). In December 2006, Claimant presented to the hospital for left sided chest pain that he reported had persisted for about a week; he was admitted for treatment for unstable angina (Tr. at 488, 491). In May 2006, Claimant sought treatment for intermittent rectal bleeding and abdominal pain; a colonoscopy was recommended (Tr. at 791-792).

In March 2007, imaging of the cervical spine showed normal alignment and no acute fracture; there was mild osteophyte formation at the C2-4 and moderate narrowing of the neural foramina at C6-7 bilaterally (Tr. at 424). In September 2007, lumbar spine testing revealed degenerative changes with broad based disc bulging at the L4-5 producing moderate central stenosis and bilateral neural foraminal narrowing as well as smaller broad-based disc bulges at the L2-3 and L3-4 with moderate central stenosis and bilateral neural foraminal narrowing (Tr. at 532). In May 2007, a Modified Barium Swallow Study showed a grossly functional oropharyngeal phase swallow (Tr. at 906). In February 2008, an MRI of the cervical spine showed right paracentral C3-4 HNP with evidence of cord impingement needing clinical correlation. There was lower cervical segment degenerative disc disease and spondylosis (Tr. at 531, 910). In March 2008, David Weinsweig, M.D., treated Claimant for low back pain with left leg pain as well as cervical spine pain. (Tr. at 485-486) An MRI of the cervical spine showed C3-4 and C5-7 multilevel degenerative

disc disease; an MRI of the lumbar spine showed multilevel degenerative disc disease at the L2-3 and L3-4 as well as the L4-5, which also had bulging disc and degenerative changes causing moderate stenosis of the lumbar spine. (Id.) Claimant reported that his posterior cervical pain was not a "major issue" for him, however, his "main pain" was the radicular pain in his left leg (Tr. at 485). On examination, Claimant had some discomfort with left leg raising on the left, however, his motor strength was strong, and his sensation was intact. (Id.) Shortly afterwards, on March 13, 2008, Claimant underwent left L3-4 and L4-5 lateral recess decompression with left L4-5 microdiskectomy (Tr. at 655-656).

In April 2008, Claimant was seen for a six-week follow-up from his surgery, and Claimant indicated that he was "extremely happy" with the results of the surgery, as he no longer had left sided pain; it was noted that his motor strength was strong (Tr. at 1271). Claimant reported he had right sided pain, and Dr. Weinsweig prescribed physical therapy and a Medrol dose pack (steroid medication) (Id.). In August 2008, an MRI of the lumbar spine showed multilevel degenerative changes secondary to broad based disc bulges and facet arthropathy; there was a cystic structure over the L4-5 (Tr. at 530, 911).

In September 2008, Claimant reported ongoing right side lower back and leg pain, and a recent MRI revealed degenerative disc disease with stenosis at the L4-5 with an epidural scar; there was no recurrence on the left side. (Tr. at 1269) Dr. Weinsweig offered physical therapy to Claimant, but Claimant declined as he did not "have time." (Id.) Dr. Weinsweig provided home exercises as possible treatment for Claimant's right sided pain (Id.).

In November 2008, thyroid testing showed a 24-hour uptake within normal limits, however, the region of the thyroid isthmus was noted to be somewhat thin on recent ultrasound

(Tr. at 545). In December 2008, Dr. Saleem saw Claimant at his physician's request for the evaluation of abnormal thyroid testing for his symptoms of fatigue, insomnia, heat intolerance, and palpitations. (Tr. at 420) In January 2009, an MRI of the head revealed a pituitary tumor with suprasellar extension and fluid levels with mass effect on optic chiasma with noted history of severe headaches (Tr. at 411, 529). Shortly afterwards, on January 29, 2009, Claimant underwent a microsurgical transphenoidal craniectomy with selective removal of pituitary tumor and cure of cerebrospinal fluid leak (Tr. at 446).

In February 2009, Claimant was twelve days post-surgery and doing well; he was prescribed hormone therapy (Tr. at 401). Claimant returned to Dr. Saleem in February 2009, and Claimant endorsed experiencing symptoms such as fatigue, headaches, heat intolerance, and insomnia; testing showed low thyroid levels (Tr. at 404-405). In April 2009, a brain MRI showed findings suggestive of a partial transsphenoidal resection; the lesion was smaller when compared to a prior study (Tr. at 528).

In July 2009, Claimant reported ongoing headaches as well as vision issues, although there was no evidence of adrenal insufficiency and no change in Claimant's visual field (Tr. at 378, 1170). In August 2009, a CTA of Claimant's head revealed no evidence of acute findings (Tr. at 511). In August 2009, Claimant also underwent a retinal consult, and an MRI revealed that the pituitary tumor removal had caused a mild optic nerve impingement. (Tr. at 1216) The examiner reported that Claimant had retinal pigment epithelium ("RPE") changes in each eye, concentrated more in the nasal macula in the right eye and a more scattered pattern in the left eye; the examiner recommended monitoring only for this condition (Tr. at 1216-1218).

In October 2009, in a subsequent visit, Claimant reported headaches and blurred vision (Tr.

10

at 1169). However, in April 2010, Claimant reported that he was doing well since the tumor removal and that his visual fields were stable (Tr. at 339). In May 2010, the examiner stated that an MRI of the brain showed that the overall size of the mass had decreased since the prior study from April 2009 (Tr. at 526). In August 2010, Dr. Saleem treated Claimant for hypogonadism, hypothyroidism, and a pituitary neoplasm; Claimant alleged insomnia and fatigue due to restless leg syndrome. (Tr. at 329) Claimant was mildly anemic, although it was improving with testosterone injections (Tr. at 333). His examination showed no heat or cold intolerance; he denied anxiety and depression (Tr. at 330). In October 2010, Dr. Hatfield noted that Claimant had no vision changes since his last office visit in March 2010 (Tr. at 1167).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that prior to June 2010, he had bad back pain which caused him to miss work and was so bad he could not stand for more than 15 minutes. (Tr. at 50-51) He also suffered from headaches once or twice a week which lasted two to three days resulting in him missing work. (Tr. at 51) Claimant stated he had pain in "all" of his joints, too, plus weekly rectal bleeding, and balancing issues that caused him to fall three to ten times a month. (Tr. at 51-53) Claimant also endorsed having problems maintaining his attention, concentration, and focus. (Tr. at 54)

Claimant testified that after his back surgery, he still had problems, and after the surgery to remove his pituitary tumor, he continued to have headaches. (Tr. at 55) He also had problems sleeping. (Id.) He stated that he took medication for pain, which caused him nausea. (Tr. at 58)

Claimant testified that during the relevant period, he would sit on the couch and watch TV; he did no housework or yardwork. (Tr. at 59)

11

Mrs. Else (Claimant's Spouse) Testimony:

Mrs. Else testified that Claimant stopped working in 2007 because his lower back pain made his legs give out; he also suffered from severe headaches to the extent she wanted to call an ambulance. (Tr. at 62) She did not believe the back surgery helped with his pain; his headaches persisted even after his head surgery, although they were not as intense. (Tr. at 62-63) She testified that Claimant switched from pain pills to over-the-counter medication because they made him sick to his stomach. (Tr. at 64-65) Mrs. Else stated that Claimant could not fall asleep, and sometimes he would be up for three or four days at a time. (Tr. at 65) She also testified that Claimant had numbness in his hands, joint pain, rectal bleeding, diarrhea, stomach pain; it was also common for Claimant to lose his balance and fall, although he mostly caught himself. (Tr. at 66-67)

Vocational Expert ("VE") Testimony:

After listening to Claimant's testimony, the VE considered several hypothetical questions posed by the ALJ with regard to an individual with Claimant's functional profile (Tr. at 73-76). The VE then testified that an individual of Claimant's age, education, and vocational background who had Claimant's limitations as described in the RFC, *supra*, would be able to perform Claimant's past work as an auto salesperson and machine assembler, as well as several representative unskilled light jobs that exist in significant numbers in the national economy (Tr. at 76-77). The VE further stated that if the individual could sit for up to 30 minutes and then would need to stand and/or walk for up to 10 minutes before returning to the sitting position, and alternating throughout the workday, the individual could not perform Claimant's past work, but could perform several unskilled sedentary jobs that exist in significant numbers in the national economy (Tr. at 78). Additionally, the VE testified that if the individual were to be off task for

15% of the workday, or was absent from work two days per month, then there would be no work available. (Tr. at 78-79)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

Moreover, Claimant must show that he became disabled prior to the expiration of his insured status on June 30, 2010. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. To be entitled to DIB in this case, Claimant bears the burden of showing that he became disabled prior to June 30,

2010, the date when his insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after his date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370, at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is just from January 9, 2007, the date of Claimant's alleged disability onset, to June 30, 2010, when his insured status expired (Tr. at 16, 23).

**Analysis**

As noted *supra*, Claimant has taken the position that in addition to the ALJ's failure to properly consider the medical evidence as it related to the RFC analysis and credibility assessment, he also failed to fully develop the evidence of record, which he contends establishes his claim for disability, as Claimant "grids out" prior to his DLI.

The Duty to Develop the Evidence:

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's

arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process. Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011)(Eifert, M.J.)(citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require him to make specific inquiries into Claimant's

treatment modalities or search for cumulative evidence; his duty is to obtain sufficient evidence upon which he can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

As an initial matter, although Claimant contends that the ALJ "down-played" his mental impairments, it is noted that Claimant did not allege any mental impairments in his initial applications, although, as reported by Claimant, he endorsed numerous symptoms during the relevant period, including: chronic headaches, insomnia, fatigue, blurred vision, balance issues, poor focus/concentration, stress triggers, flushing, hot flashes, low testosterone, and brain fog. (ECF No. 11 at 7) However, the ALJ expressly considered the medical evidence from March 2004 through November 2018, which predated Claimant's alleged onset date and postdated his DLI.[2] (Tr. at 16-21, 1063-1064, 1133, 1102-1103, 1035, 488, 1167) In addition, the ALJ reviewed other evidence, which included Claimant's statements and testimony, as well as his wife's testimony, concerning his limitations and symptoms from his physical and mental conditions. (Tr. at 16, 19-20) The ALJ also considered the opinions provided by the state agency consultants, including an

---

[2] Numerous medical records predated and postdated Claimant's DLI were exhibited to the ALJ's written decision. "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill, 2017 WL 2805498, at *4 (N.D.W.Va. June 28, 2017) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite to specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*). Notwithstanding the ALJ's notation that "[t]he rem[a]inder of the evidence is dated after the claimant's date last insured of June 30, 2010 and therefore not relevant to the claim before the undersigned." (Tr. at 19)

opinion from 2017 from one of Claimant's medical providers. (Tr. at 20, 21) Specifically, the ALJ noted and considered Claimant's complaints with regard to his anemia, vitamin D deficiency, restless leg syndrome, trouble sleeping, persistent diarrhea, migraines, heat intolerance, joint pain, vision issues, balance issues, poor focus/concentration, fatigue, that stress triggers symptoms that can be life-threatening if untreated, bilateral hand pain and numbness, pervasive joint pain, as well as chronic neck and back pain with radiation into both lower extremities. (Tr. at 14-20) This also included the evidence documenting the treatment for these conditions (Id.), and the evidence showing what exacerbates his pain and other symptoms – such as standing more than 15 minutes, walking for any length of time, bilateral hand pain and numbness (Tr. at 16). The ALJ also noted that the medical record demonstrated that some of Claimant's symptoms were controlled by his medication, such as his anemia (Tr. at 14), or resolved and/or stabilized with more invasive, surgical treatment, such as his back surgery and the removal of his pituitary tumor (Tr. at 21, 17-19, 20).

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision, save a generalized statement that neither a physical consultative examination nor a mental consultative examination were obtained in this case. (ECF No. 11 at 7) It is noted however, that when the evidence is deemed sufficient in order to render a disability determination, an adjudicator need not order a consultative examination, and that such decisions are within the ALJ's discretion. See 20 C.F.R. §§ 1519a, 1519b. Moreover, as recognized by the ALJ as well as Claimant himself, the relevant period concerns Claimant's alleged impairments from January 9, 2007 through June 30, 2010 – a period that predates the ALJ's decision by several years – Claimant does not explain how a subsequent consultative examination would assist the adjudicator when the

medical record has been 'closed' for so long.

Nevertheless, it is clear that the ALJ made numerous references throughout the written decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Additionally, the ALJ left the record open following the administrative hearing to allow Claimant's counsel to submit additional records (Tr. at 80); the additional records were included in the list of exhibits concerning medical records having been considered by the ALJ in rendering his decision (Tr. at 27-28, 1030-1124, 1125-1161, 1162-1221, 1222-1241, 1242-1259, 1260-1266, 1267-1283). Moreover, the ALJ considered the post-hearing brief submitted on Claimant's behalf by his counsel. (Tr. at 19-20, 291-292) In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further develop the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

The ALJ's Consideration of the Medical Record:

In a conclusory fashion, Claimant asserts that the medical records supported his claims of disabling impairments, he does not specify which impairment specifically meets or equals any Listing, only that the back and pituitary tumor surgeries provided no relief, coupled with numerous other symptoms related to "headaches, joint pain, insomnia, fatigue, blurred vision, balance issues, diarrhea, poor focus/concentration, stress triggers, flushing, hot flashes, low testosterone, brain fog, chronic bilateral hand numbness, and carpal tunnel syndrome" (ECF No. 11 at 6).

The Regulations provide:

In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis

of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found numerous impairments that were not severe enough to have significantly limited Claimant's ability to perform basic work activities, including anemia, a vitamin D deficiency, and restless leg syndrome (Tr. at 14). The ALJ found that Claimant's vitamin D deficiency was treated with a

supplement replacement, that his restless leg syndrome affected his ability to sleep at night, and his anemia was improving. (Tr. at 14, 419, 391) However, though the ALJ acknowledged that other impairments were mentioned in the record "from time to time", none caused any significant limitations in functioning or did not last for a continuous period of twelve months; he did state that "any non-severe impairment" was taken into account in the RFC assessment. (Tr. at 14-15)

Next, at the third step of the sequential evaluation process, the ALJ evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Tr. at 15) He noted that none of the examining or treating physicians' reports showed that Claimant had evidence of ambulatory deficits, nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, as required by Section 1.04. (Tr. at 15, 424, 532, 655)[3] With regard to the Peripheral Neuropathy Section 11.14, the ALJ found the Listing was not met as there was no evidence of disorganization of motor function as described in 11.04B in spite of prescribed treatment. (Tr. at 15, 1102-1103)[4] Finally, the ALJ considered Listing 11.00 dealing with neurological disorders and found that examining and treating physicians' reports did not indicate any disorganized motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or using the upper extremities as required by 11.05. (Tr. at 15, 1269)[5]

Later in the written decision, the ALJ acknowledged Claimant's allegation that he has a history of joint and low back pain for many years that was initially treated conservatively, however,

---

[3] The ALJ cited records from St. Mary's Medical Center which included an x-ray of Claimant's neck dated March 2007, an MRI of Claimant's lumbar spine dated September 2007, and the March 2008 operative report concerning Claimant's back surgery.

[4] The ALJ cited a Marshall University Rheumatology Clinical Note dated February 2005 that concerned Claimant's complaints of bilateral elbow and carpal tunnel symptoms and recommendation that he use splits.

[5] The ALJ referenced a September 2008 letter from Dr. Weinsweig to Claimant's primary care provider recommending Claimant participating in physical therapy for Claimant's right-sided lower back and leg pain.

his back pain became so severe he had to undergo surgical intervention. (Tr. at 16, 260) The ALJ also recognized that Claimant had developed persistent diarrhea, trouble sleeping, migraines, and heat intolerance that required extensive testing before a pituitary brain tumor was discovered, which also required surgical intervention (Tr. at 16) It was noted that the removal of the tumor and the pituitary gland resulted in Claimant having to be placed on life-long hormone replacement and that the condition will never get better. (Id.) The ALJ further noted that despite this treatment, Claimant endorsed continued symptoms, including headaches, joint pain, vision and balance issues, trouble sleeping, diarrhea, poor focus/concentration, and fatigue; additionally, Claimant reported that his condition required close monitoring because stress can trigger symptoms, resulting in life-threatening problems if left untreated. (Tr. at 16, 258.)

The ALJ also considered Claimant's claims of bilateral hand pain and numbness, as well as his claim in March 2004 of a sudden onset of all over joint pain. (Tr. at 16, 1063-1064) It was noted that EMG testing in February 2005 indicated mild right carpal tunnel syndrome, for which he was prescribed bilateral wrist splints. (Tr. at 17, 1102-1103)

The ALJ also reviewed the evidence as it related to Claimant's low back and neck pain. Noting that Claimant received adjustments from a chiropractor for his low back pain with left-sided radiation (Tr. at 17, 1133), but he continued to have problems, as well as flushing and hot flashes (Tr. at 17, 1035, 488). The ALJ noted that x-ray testing in March 2007 of Claimant's neck was unremarkable, though positive for degenerative disc disease and lumbar spine testing in September 2007 also revealed degenerative changes with disc bulging. (Tr. at 17, 424, 902, 532, 907) The ALJ noted that although Claimant reported his neck pain "was not a 'major issue' for him" in late 2007, he reported that physical therapy for his low back and left leg pain did not help,

21

therefore, he underwent surgery in March 2008. (Tr. at 17, 655, 1273) The ALJ further noted that Claimant reported being "extremely happy" with the results of his surgery because he no longer had left-sided pain, though he began to have pain on his right side, for which he was prescribed medication and physical therapy. (Tr. at 17, 1271) The ALJ noted that at follow-up visit in September 2008, Claimant continued to report right-sided pain, which was corroborated by a recent MRI, without a recurrence of left-sided pain, however, Claimant reported "he did not 'have time' to attend" physical therapy, so home exercises were provided. (Tr. at 17, 1269)

The ALJ then reviewed the evidence of record concerning Claimant's complaints of heat intolerance, headaches, and fatigue, which testing revealed to be related to his thyroid. (Tr. at 18, 545, 920, 422) Because more testing was advised, an MRI of Claimant's head in January 2009 revealed a large pituitary tumor that had mass effect on optic chiasma with a noted history of severe headaches, accordingly, surgery was advised. (Tr. at 18, 1268) Noting that Claimant underwent surgery to remove the pituitary tumor as well as cure of cerebrospinal fluid leak, the ALJ recognized that the record indicated Claimant did well and was discharged a short time later in stable condition. (Tr. at 18, 446) The ALJ further recognized that during a post-operative follow-up appointment twelve days later that Claimant was doing well and that he would require hormone replacement therapy. (Tr. at 18, 401) Although Claimant endorsed continued problems with fatigue, insomnia, heat intolerance, and very low testosterone during a visit in February 2009, MRI testing revealed no recurrence of the tumor. (Tr. at 18, 404, 407, 528) Although Claimant reported ongoing headaches in July 2009, a CTA in August 2009 revealed no evidence of acute findings. (Tr. at 18, 378, 561) Because of his vision complaints, the ALJ noted in October 2009, Claimant received a retinal consult; due to RPE changes in each eye, continued monitoring was

22

recommended. (Tr. at 18, 1218) The ALJ noted that Claimant continued to complain of headaches and blurred vision, monitoring was continued (Tr. at 18-19, 1169, 1200); by April 2010, the medical record noted Claimant was doing well since the pituitary tumor removal and that a subsequent MRI revealed a mass, however, it decreased in size and there was no displacement or distortion of the optic chiasm. (Tr. at 19, 339, 526) Finally, the ALJ noted that in October 2010, although Claimant reported vision loss and watering of his eye, the examiner found no vision changes since his last visit. (Tr. at 19, 1167)

Clearly, the ALJ considered the medical evidence as well as Claimant's reported symptomology from the relevant time period. Regardless of Claimant's frequent recitation of the various diagnoses and symptoms related thereto in his brief (ECF No. 11), this is not the litmus test for disability, as it is also well known that diagnoses alone do not establish disability, because there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (*per curiam*) (internal citations omitted). Nevertheless, as discussed *infra*, the ALJ did consider this evidence in rendering his decision.

Accordingly, to the extent Claimant contends the ALJ "failed to appreciate the gravity of the removal of [Claimant's] pituitary tumor, back surgery, and degenerative disc disease of the cervical and lumbar spine, and attendant health problems[]", the undersigned **FINDS** that argument lacks merit.

Evaluation of Symptoms in Disability Claims:

Claimant conclusively asserts that the ALJ's "failure to give proper consideration to the medical evidence of record critically impacted both the residual functional capacity analysis and credibility determination" (ECF No. 11 at 5), however, as discussed *supra*, the ALJ properly

considered the medical evidence. Nevertheless, as explicitly noted by the ALJ, the ALJ considered Claimant's symptoms and to the extent they could be reasonably consistent with the objective medical evidence. (Tr. at 16, 19, 20)

Social Security Ruling ("SSR") 16-3p[6] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 require a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports

---

[6] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 404.1529(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

Following the discussion of the medical evidence, the ALJ considered Claimant's statements about the intensity, persistence, and limiting effects of his symptoms, finding them not entirely consistent with the medical record: with respect to his back pain, the ALJ acknowledged that Claimant had a long history of joint and low back pain with radiation into his left leg, and that the medical record showed that this condition improved after his 2008 surgery; the ALJ again noted that Claimant reported being "extremely happy" with the results of his surgery (Tr. at 20, 1271); the ALJ also acknowledged that Claimant reported that although his left leg pain had not returned since surgery, he started having right leg symptoms, but declined physical therapy due to lack of time and instead opting for home exercises (Tr. at 20, 1269).[7] With respect to Claimant's pituitary tumor removal, the ALJ noted that follow-up testing indicated that the tumor did not return, and that there was no significant impairment to Claimant's visual fields. (Tr. at 20) The ALJ also noted that Claimant stated that during the relevant period, he was able to drive, he played video games and watched television, and that he was able to perform some household chores and his daily activities. (Id.)

The ALJ also considered Claimant's wife's statements that the back surgery did little to help this condition and that Claimant experienced excruciating headaches prior to and for about a year after the tumor removal. (Tr. at 19) The ALJ recognized that Mrs. Else stated Claimant "was often in a fog at that time", that he could not sleep for very long, and that stress worsened his condition to the point he was in danger of developing Addison's disease, which can be fatal; he

---

[7] It is noted when a claimant fails to follow prescribed treatment by a medical source without a good reason, he will not be found disabled. See 20 C.F.R. § 404.1530(b); see also, Dunn v. Colvin, 607 Fed.Appx. 264, 275-276 (4th Cir. 2015) (noncompliance with a treatment regimen can undermine a claimant's allegations regarding the severity of his alleged symptoms); Myers v. Commissioner, 456 Fed.Appx. 230, 232 (4th Cir. 2011) (noncompliance is relevant for evaluating the subjective limitations from a condition).

also noted that she stated Claimant was frequently irritable, had trouble concentrating, lost his hair as well as muscle mass during that time. (Id.) The ALJ noted Mrs. Else was not medically trained to make exacting observations, and ultimately determined her statements did not support a finding that Claimant was disabled and were not consistent with the preponderance of the evidence. (Id.)

The ALJ considered Claimant's counsel's post-hearing brief, acknowledging his position that Claimant's long-standing history of neck, low back, elbow, hand, and knee pain had not been relieved by any of his surgeries or conservative treatment; however, the ALJ found this was inconsistent with the preponderance of the opinions and observations by the medical doctors in the file. (Tr. at 19-20, 291-292)

In sum, despite Claimant's blanket assertion that the ALJ failed to properly consider the medical evidence of record and incorporate same into the credibility analysis, it is clear that the ALJ considered the evidence from the relevant period when reconciling Claimant's statements with the objective medical records. Moreover, it is apparent that the ALJ properly considered the treatment provided for Claimant's severe impairments and compared those results with Claimant's subjective complaints – the impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Nevertheless, there is no evidence from the record that Claimant's conditions caused him significant functional limitations that precluded all employment.

Accordingly, the undersigned **FINDS** the ALJ's credibility analysis, or rather, his evaluation of Claimant's symptoms pursuant to SSR 16-3p, is supported by substantial evidence.

The RFC Assessment and Alternate Fifth Step Finding:

As with the credibility determination, Claimant conclusively states that the ALJ also failed to properly consider the medical record when rendering the RFC assessment: "it is difficult to understand how the [ALJ] concluded that the residual limitations resulting from [Claimant's] pituitary tumor removal and laminectomy are not disabling in nature prior to [Claimant's DLI]." (ECF No. 11 at 5) Claimant provides no further development in support of this argument, save for the repeated recitation of diagnoses and symptoms the undersigned noted were reviewed by the ALJ in the written decision (Id. at 5-7) To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, as noted *supra*, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient notations from the record that documented Claimant's subjective complaints related to his physical impairments, which included his pituitary tumor removal surgery, back surgery, neck and overall joint pain (See, e.g., Tr. at 20-21), and compared these with the overall evidence before him. This included the opinion evidence provided by state agency medical consultants, Drs. Larry Curnutte and Uma Reddy, both of whom opined they were unable to make an assessment during the relevant time due to insufficient evidence (Tr. at 20, 102-107, 109-114). Significantly, while the ALJ noted that their opinions were "reasonable at the time they were rendered", additional evidence received since then indicated that Claimant was more limited during the relevant period than originally thought, and accordingly, determined Claimant

was capable of light level work with additional postural and environmental limitations. (Tr. at 20-21)

Additionally, to the extent that Claimant has argued these diagnoses and treatment notes corroborate a disability finding, and that the ALJ should have consulted a medical expert concerning the cumulative impact of the residual limitations resulting from his impairments and related symptoms (ECF No. 11 at 7-8), it is well known that the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. 20 C.F.R. § 404.1527(d)(2).[8] As noted *supra*, these records do not contain any statements concerning functional limitations or what Claimant "can still do despite [his] impairment" that would lend themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. § 404.1527. Once again, because diagnoses alone do not establish disability, because there must be a showing of related functional loss. <u>Gross v. Heckler</u>. Therefore, Claimant's bare recitation of the numerous diagnoses and treatment provided therefore by various providers, without any corresponding functional limitations, is of no moment. Nevertheless, as discussed *supra*, the ALJ did consider these records in rendering his decision.[9]

It is significant that the ALJ found Claimant was capable of doing his past work during the relevant period at step four, and pursuant to the pertinent Regulations, supra, was under no duty to

---

[8] See also, 20 C.F.R. §§ 404.1545(a), 404.1546(c) (the RFC assessment is solely within the adjudicator's purview, not a physician's).

[9] Though Claimant does not refer to this in his brief, the ALJ also considered the "[m]any years after the date last insured" opinion of Daniel Macias, M.D., who reported that Claimant's "hormone replacement therapy would never be the same as natural endogenous production" and that during an assessment in 2017 he opined that "[C]laimant might indeed have sufficient reasons to file for disability, as it must be hard for him to work steadily with so many problems and medications." (Tr. at 21, 1001-1004, 1011-1029, 1242-1259) The ALJ recognized, however, that the determination as to whether a claimant is disabled or unable to work is an issue reserved to the Commissioner, however, he gave the opinion "little weight" because it was based on Claimant's subjective complaints and given nearly seven years after Claimant's DLI.

proceed to the fifth step in the sequential evaluation process. To that extent, Claimant had not made a *prima facie* showing of disability, therefore, the burden of going forward with the evidence never shifted to the ALJ. Regardless, the ALJ in this case made an alternate fifth step finding. While Claimant makes a cursory argument that the ALJ erred by failing to find that he "grids out" prior to his DLI, because he was limited to sedentary work pursuant to the Medical-Vocational Rules 201.12 or 201.14 (ECF No. 11 at 8), he overlooks the fact that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7.

Given the foregoing review of the evidence of record, the undersigned **FINDS** that the VE's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c)(2); 404.1566(e). In sum, the undersigned **FINDS** the RFC assessment is supported by substantial evidence.

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that he can work at light exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, including imaging, and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony, as well as his wife's testimony; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of light work during the relevant period despite his subjective complaints, provided sufficient explanation allowing for meaningful judicial review. <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. <u>Mascio</u>, 780 F.3d at 637.

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant was not disabled from January 11, 2007 through June 30, 2010 is supported by substantial evidence.

## <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 11), **GRANT** the Defendant's request to affirm the decision below (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 28, 2020.



Omar J. Aboulhosn
United States Magistrate Judge